2020R00687/LER

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Cathy L. Waldor |
| v. | : | Magistrate. No. 21-9050 |
| GAURAVJIT SINGH | : | **CRIMINAL COMPLAINT** |

I, Charles Paddock, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Federal Bureau of Investigations, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

_____
Charles Paddock, Special Agent
Federal Bureau of Investigations

Special Agent Paddock attested to this Affidavit by telephone pursuant to F.R.C.P. 4.1(B)(2)(A) on this 15th day of January, 2021.

_____
Hon. Cathy L. Waldor
United States Magistrate Judge

## ATTACHMENT A

### Count One
### (Wire Fraud)

From at least as early as in or around the beginning of May 2020 through on or about June 2020, in the District of New Jersey and elsewhere, defendant,

### GAURAVJIT SINGH,

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, to wit:

| Count | Approximate Date | Description |
|---|---|---|
| 1 | May 15, 2020 | Interstate wire of approximately $500,000 fraudulently obtained from Victim Company-2 |

In violation of Title 18, United States Code, Section 1343.

## **ATTACHMENT B**

I, Charles Paddock, am a Special Agent of the Federal Bureau of Investigations. The information contained in the complaint is based upon my personal knowledge, as well as information obtained from other sources, including: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly available information; and (c) my review of evidence, including business records, bank records, and other documents and records. this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where the contents of documents and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

1. At all times relevant to this Complaint:

    a. Defendant Gauravjit Singh ("SINGH") was a resident of Pennsylvania who purported to do business in New Jersey, New York, Pennsylvania, and elsewhere.

    b. SINGH was associated with and believed to be the owner of Mask Medical, LLC ("Mask Medical"), established in New Jersey in or around March 2020, and GJS Solutions, LLC ("GJS"), established in New York in or around January 2018.

    c. Victim Company-1, a limited liability company established in New York, was owned by Individual-1.

    d. Victim Company-2 was a limited liability company established in New York (together with Victim Company-1, the "Victim Companies").

    e. Individual-1 and Individual-2 (together, the "Individuals") were principals of Victim Company-2.

    f. Victim Company-1 entered a product agreement with Mask Medical. Victim Company-2 funded the product agreement.

    g. Victim Company-2 maintained a bank account at Bank-A, which had an account address located in New York (the "Victim Company-2 Account").

h.  GJS maintained a bank account at Bank-B, opened on or about May 13, 2020, which had an account address located in Pennsylvania (the "GJS Account").

i.  SINGH maintained a personal bank account at Bank-B, which had an account address located in Pennsylvania (the "SINGH Account").

j.  SINGH maintained a personal brokerage account at Bank-C, which had account addresses located in New Jersey and Pennsylvania (the "SINGH Brokerage Account").

**The Scheme to Defraud**

2.  Beginning at least as early as in or around May 2020 through in or around June 2020, in the midst of the COVID-19 pandemic, SINGH engaged in a scheme to defraud the Victim Companies. SINGH made misrepresentations to the Individuals, inducing Victim Company-1 to enter into an agreement with Mask Medical pursuant to which SINGH would be paid approximately $7,125,000 in exchange for approximately 1,500,000 medical gowns. SINGH made misrepresentations to the Individuals, inducing the Individuals, via Victim Company-2, to pay SINGH a total of approximately $712,500, representing a 10% initial deposit under the agreement. Instead of purchasing and delivering medical gowns, SINGH used the funds for personal expenses.

3.  In or around May 2020, the Individuals began negotiating with SINGH to purchase approximately 1,500,000 medical gowns (the "Medical Gowns"), which ultimately were to be sourced to the City of New York amid the COVID-19 pandemic. SINGH represented that he had contacts, including "Anna," at a factory in Nanjung, China (the "Factory") that manufactures medical gowns.

4.  SINGH made misrepresentations to the Individuals during this negotiation period. For instance, on or about May 11, 2020, SINGH sent Individual-1 photos and videos purporting to show Factory workers preparing the Medical Gowns for shipment.

5.  On or about May 12, 2020, after the Individuals met SINGH in person at a location in Bridgewater, New Jersey to discuss the deal, SINGH indicated via text message to Individual-1 that SINGH confirmed the availability of the Medical Gowns with his contact at the Factory and that the Medical Gowns would be ready to ship the next day.

6.  On or about May 13, 2020, SINGH sent Individual-1 a product agreement. SINGH noted to Individual-1 via text message he "wanted to get this part done," referring to the product agreement, so he could "confidently tell Anna to get her plane ready and scheduled with the pilot." SINGH further told

Individual-1: "If I can tell Anna confidently that we are good to go and get plane and all ready, we should be able to get it here by Monday," referring to delivery of the Medical Gowns on or about May 18, 2020.

7. Based on these representations, on or about May 14, 2020, Mask Medical and Victim Company-1 entered into a product agreement (the "Agreement"), which SINGH and Individual-1 executed.

8. Under the terms of the Agreement, Mask Medical would deliver the Medical Gowns. The Agreement required a 10% initial deposit, totaling approximately $712,500, to be followed by additional installments: 5% once the Medical Gowns cleared Chinese customs and an airway bill was provided; 15% upon delivery in Plainfield, New Jersey; and the remaining 70% after Victim Company-1 received payment for the Medical Gowns from Victim Company-1's customer.

9. Also on or about May 14, 2020, SINGH told Individual-1 via text that he confirmed with "Anna" that the Medical Gowns were ready to be packaged and loaded on a plane for shipment. He further indicated that he would tell "Anna" to load the plane with the Medical Gowns once SINGH received the 10% deposit via wire transmission.

10. Based on SINGH's representations, and pursuant to the terms of the Agreement, on or about May 15, 2020, Victim Company-2 wired approximately $500,000 from the Victim Company-2 Account to the GJS Account. On or about May 18, 2020, Victim Company-2 wired approximately $212,500 (together, the "Victim Funds") from the Victim Company-2 Account to the GJS Account.

11. After SINGH received the Victim Funds, he made additional misrepresentations and excuses to the Individuals, ensuring them that they would receive the Medical Gowns. For instance:

    a. On or about May 16, 2020, SINGH advised via text that the Medical Gowns "should be coming" on Wednesday, referring to on or about May 20, 2020.

    b. On or about May 18, 2020, SINGH confirmed via text that the plane carrying the Medical Gowns would be leaving the following evening.

    c. On or about May 25, 2020, SINGH indicated that the plane carrying the Medical Gowns would arrive at John F. Kennedy International Airport on or about Wednesday, May 27, 2020. Despite requests, SINGH never sent corroborating flight or shipping information to the Individuals. The shipment did not arrive.

12. On or about May 26, 2020, the Individuals asked SINGH to cancel the Agreement and to return the Victim Funds.

13. On or about May 27, 2020, SINGH sent the Individuals an email falsely claiming that he was able to secure substitute medical gowns by swapping an order with another client. SINGH included a video purporting to show medical gowns available for delivery to the Individuals (the "May 27, 2020 Video"), as well as shipping documentation with the email. SINGH requested an additional 5% deposit from the Individuals, noting that failure to make this payment would result in a default under the Agreement.

14. Subsequent investigation revealed that the gowns in the May 27, 2020 Video and related shipping information were purchased by a third party (the "Third-Party Customer") in California. The Third-Party Customer had no knowledge of SINGH and never agreed to sell SINGH medical gowns.

15. SINGH never provided the Medical Gowns, or any product, to the Individuals or to the Victim Companies.

16. SINGH's conduct resulted in approximately $712,500 in losses to Victim Company-2.

17. A review of bank records revealed that SINGH did not use any of the Victim Funds to purchase the Medical Gowns, or any other personal protective equipment.

18. For instance, after receiving the remainder of the Victim Funds, from on or about May 18, 2020 to on or about May 27, 2020, SINGH made several transfers from the GJS Account to the SINGH Account, SINGH's personal account, totaling approximately $563,000.

19. SINGH made various personal expenditures with the transferred Victim Funds from on or about May 18, 2020 to on or about May 29, 2020. In particular, of the approximately $563,000 in transfers, SINGH conducted: approximately four wire transfers to an account held at Bank-A totaling approximately $270,000; approximately four transfers to the SINGH Brokerage Account, totaling approximately $220,000; approximately 33 transactions with online gaming entities, totaling approximately $21,700; and approximately $18,000 in other personal expenditures, including, but not limited to, approximately $5,000 for a credit card payment; approximately $5,100 for a luxury automobile; approximately $1,700 to a Thai restaurant located in Florida; and approximately $1,300 in travel expenses.